OTHELIA M. McCLISH, etc., v. ESTELLE Y. RANKIN, et vir.

14 So. (2nd) 714            June Term, 1943
July 20, 1943            En Banc

*George Palmer Garrett* and *Hubert E. Griggs,* for appellant.

*John D. Shepard* and *Rogers & Rogers,* (Covington, Kentucky), for appellees.

THOMAS, J.:

Ultimately we must decide whether the appellant, Othelia M. McClish, or the appellee, Estelle Y. Rankin, is entitled to the property left by W. S. Yeager who died intestate. The latter was his sister and only heir; the former claimed that she was his common-law wife.

As we wend to a conclusion it is necessary to pass upon the sufficiency of the bill to withstand the attack on the lone ground that it was without equity, and upon the adequacy of the testimony to substantiate a decree in favor of the appellee. We will consider them in that order.

With haste that appears inordinate the appellant, on the day following the death of W. S. Yeager, filed in the county judge's court a petition seeking letters of administration and representing that she was his wife. A few months later the bill we are reviewing was filed questioning the existence of the common-law marriage between the appellant and W. S. Yeager on which, it was alleged, her claim to his estate was founded. The motion to dismiss was denied, whereupon, the defendant answered. Issues having been formed by these pleadings the testimony of the parties litigant was introduced before a special examiner who subsequently reported it to the chancellor. Before any witnesses were heard it was stipulated by counsel "that the sole question between the

parties . . . is the fact of marriage or nonmarriage, and that if the Court . . . determines the fact of marriage in favor of the complainants, then and thereupon all the allegations of the bill of complaint will be deemed proven. If the Court . . . determines the fact of marriage in favor of defendant, then the answer . . . shall be . . . fully sustained, and . . . the bill of complaint will be dismissed in its entirety." In urging before this Court the incorrectness of the chancellor's view that the bill contained equity appellant has injected the matter of the jurisdiction of the court of equity to entertain the suit. In passing we may observe that we have examined this pleading and in our opinion it does comprise allegations showing real basis for equitable relief and the chancellor ruled properly when he required the defendants to file an answer.

We see no need elaborately to discuss the subject of any concurrent jurisdiction which may have existed in the probate and chancery courts or, for that matter, the effect upon the jurisdiction of the latter of the petition for letters of administration in the former. The record reveals no direct challenge of jurisdiction of the chancery court unless it can be said to have been presented in the motion to dismiss, on the theory that there was no equity in the bill because it showed that the controversy should have been entertained and determined by the probate court which had already heard the petition for the appointment of the appellant as administratrix. Even this feature becomes insignificant in view of the stipulation because there can be no doubt from its language that the parties, through their solicitors, waived any jurisdictional question, within their power to waive, and that they intended to confer upon the chancellor jurisdiction to determine the matter immediately in dispute, that is, whether the appellant and the deceased were, in fact, man and wife when he died. Long since, this Court decided, Williams v. Wetmore, 51 Fla. 614, 41 So. 545, that an agreement of this kind could have no effect if the subject matter was such as could not be entertained and determined by the particular tribunal. Applied to the present situation we must say whether the bill and answer presented an issue which the

equity court had an inherent right to hear. If it did then the cause should have proceeded there on account of the stipulation, regardless of the administration of the estate in the county judge's court. The answer is easily reached. It is the theory of the bill of complaint that the appellant posed as the common-law wife of Yeager for the purpose of gaining possession and control of the assets of his estate to the end that the only heir, appellee, would be fraudulently deprived of them. The gist of appellee's case is the alleged authorship on the part of appellant of a scheme calculated to defeat the right of the appellee to the property.

This is certainly a matter cognizable by a court of equity and the appellant having assented to the entertainment of the issue by that tribunal, the present challenge to jurisdiction must be denied without further ado, for we are not "called upon to make a rigorous and critical examination in order to discover the lack of jurisdiction." Williams v. Wetmore, *supra*.

The only question remaining for our consideration is one purely of fact and in order to reach a conclusion on the propriety of the ruling that no common-law marriage was contracted by the appellant and the deceased, it is well to give a brief history of these two persons and a chronicle of their lives together. We pause, however, to observe that this Court is committed to the general rule that one assailing the legality of a marriage must prove his case. Le Blanc v. Yawn, 99 Fla. 328, 126 So. 789. In doing so he may have to resort to negation. The bill here charged the defendant with being an interloper, wholly unrelated to the deceased, and alleged that her pretension to being his wife was false and without foundation in law or equity. This appellee undertook to prove.

The appellant was born in Ohio and from her early girlhood had lived in the town where the deceased practiced medicine. As a young woman she had consulted him professionally and eventually a meretricious relationship developed between them. During this period he was married to another and the union was not severed by divorce until November, 1940. Meanwhile, his association with the appel-

lant continued and on at least one occasion, prior to the divorce, he took her on a trip to a northern city where they registered at a hotel as man and wife and resided together for several days. She admitted this illicit cohabitation. He had purchased property in the State of Florida where, evidently, he and his wife spent much of their time and where they were living in nineteen hundred and forty. During that year the wife left the home to attend her mother who had become sick in a northern state. While she was away appellant joined the husband in Florida. The wife returned and discovered the appellant ensconced in the house with her husband. This doubtless precipitated the separation and divorce. He sent the appellant back to Ohio and later, after the divorce was granted, he returned there ostensibly to take care of some business matters. He arranged with her to accompany him back to Florida. Evidently, it occurred to him that persons of opposite sex could not travel across state boundaries freely and with impunity, so on the eve of their departure from Ohio the deceased secured the services of a justice of the peace to transcribe an agreement he dictated providing for his employment of the appellant as his private secretary. The official was very definite in his narrative of the transcription and the acknowledgment before him of the instrument and even the appellant, in her testimony, admitted that the document was drafted to protect deceased against prosecutions for violation of the "Mann Act." The following morning they set out for Florida to resume their residence and within six months Yeager was dead. The house they occupied was located in a small settlement and, as is characteristic with communities of its size, all residents were fairly familiar with the activities of one another. There is abundant evidence by witnesses apparently unconcerned in the outcome of this litigation that they were not reputed to be husband and wife and that in conversations with him he referred to her variously as his secretary, his sister, his stenographer, his niece, "the Blonde" and, on a Christmas card from them to some friends, "his working force." The sister and her husband testified that they knew nothing of the pretended marriage relationship until after Yeager died.

It was stipulated by counsel that for several years embracing the period from the so-called common-law marriage until his death about five months later she maintained a bank account in her maiden name. She was approximately twenty years his junior.

At the outset we referred to the extraordinary dispatch with which she sought letters of administration when he departed this life. He died early Sunday morning. Meanwhile, one of the servants had wired the appellee, his sister, that he was seriously ill and she immediately left for Florida, arriving Sunday night. The sister took complete charge of the arrangements for transporting the body to the old family home in Kentucky for burial. Despite this authority assumed by the sister, appellant, before the body was shipped, made application for letters of administration of his estate. Her explanation of the haste was curious. It was necessary, so she said, that funds might be obtained immediately to compensate the funeral director. It is not explained why the funeral of a person of obvious means could not have proceeded until an administrator was designated. Any remuneration for the services of an undertaker constituted a preferred claim against the estate and the source of such compensation would not have been affected by the speed with which such appointment was made.

It was the appellant's story that immediately after the execution and the acknowledgment of the strange agreement to safeguard him in the event that travel together should be questioned by the federal authorities and on the night preceding their departure for Florida they "had a little private ceremony of [their] own." The appellant continued: "We both agreed it was best that way . . . and when he put the rings on my finger he said, 'I take thee, Othelia McClish as my wife until death do us part,' and I said, 'I take thee, William Saunderson Yeager as my husband until death do us part.' "

Appellant presented testimony that upon certain occasions she was introduced by the deceased as his wife but the infrequency of these occurrences coupled with their conduct in registering in at least one hotel as man and wife even before

he was divorced do not lend particular emphasis to the claim that the relationship of man and wife actually existed and certainly warranted the chancellor, after he had weighed all the evidence, in finding for the appellee.

Adverting to the question of burden of proof, it is also the rule, with which counsel for appellant in his brief states that he is familiar, that where a sexual relationship is shown to have been meretricious in its inception it is presumed to continue. Thus, when testimony offered by the appellee established cohabitation between the appellant and the deceased at a time when the latter was ineligible to marry the burden shifted and it was her duty to show the metamorphosis from concubinage to marriage. To establish this transformation she relied largely, if not entirely, upon the simple rite which no one witnessed. Apparently, the chancellor believed that it did not take place. In considering the testimony she gave about it we have not overlooked the inhibition of the statute with reference to evidence of transactions with persons deceased, Section 90.05, Florida Statutes, 1941, but we understand from the appellee's brief that she waives any objection on this score. If this provision of the law were invoked there would be no proof whatever of the supposed contract. The point having been waived establishment of such an agreement yet depends entirely upon the appellant's testimony.

Because of the intrinsic importance to democratic government, and to society itself, of the institution of marriage, much has been written by the courts of the land on the subject of those unions contracted without ceremony. The law universally condemns cohabitation without the bonds of wedlock and every effort has been made by the state and federal law makers to discourage and thwart it. By such precautions the very foundation of society, the home, has been safeguarded; the destructive results of promiscuity such as tangled property rights have at least been curtailed.

To lend dignity and solemnity to the marriage venture the law provides that it be inaugurated by a minister of the gospel, a judicial officer or a notary public. Despite the formalities required and the obvious importance of them some of the states recognize a marriage without ceremony.

Many of them, however, have either abolished this form of contract or have refused to countenance it in the first instance, but it is approved or tolerated in Florida. Thus as Mr. Justice TERRELL points out in Le Blanc v. Yawn, *supra,* an anomaly of the first degree is apparent for "common-law . . . marriages were not recognized in the Colonies, and were abolished in the mother country [source of our common law] prior to the Revolution."

The thought that there may have been at one stage of the development of this country reasons for entering the marriage contract without the performance of any rite is suggested by an opinion of one of the civil courts of appeals of Texas, McChesney v. Johnson, 79 SW. 2d 658. It was commented in that decision that sparseness of settlements, difficulty of travel, inaccessibility of ministers or officers given the right to perform the ceremony and unfamiliarity, through illiteracy, furnished some justification for dispensing with the formal marriage vows.

The same considerations, of course, applied to Florida as it progressed from infancy to its present state of development. These conditions, however, do not now obtain. Distances to cities have shrunk because of modern methods of travel; a network of improved roads and arterial highways has made county seats, cities and towns accessible to nearly every dweller; churches have been established galore; and a school system furnishes the advantages of education even to the slothful. Why, then, should the common-law marriage be given the same recognition and dignity now that Florida has emerged from the status of a frontier? We can give no logical reason and although we will not attempt to abolish it by judicial fiat we will examine the evidence of such transactions with increasing caution for as the reasons for making informally a contract of such moment become more obscure so should the effort to establish it grow more difficult. This seems harmonious with the trend of late decisions and modern thought toward the abolition of consensual marriage.

There may remain in the State persons who are so situated because of remoteness from county seats and populated centers that they must enter the marriage contract without.

license and benefit of clergy, but the appellant and the deceased did not belong even on the fringe of this category. Hazarding the charge of repetition: he was a man of parts, educated for the medical profession, schooled in business affairs and familiar with the responsibilities of marriage, having already been at least twice legally married. He had traveled frequently between Ohio and Florida; had accumulated considerable property; had reached the approximate age of fifty-five. She had been reared in a town of some proportions; had traveled to some extent; had become more than thirty years of age. Their background and experience controvert the idea that their association together was intended to be a common-law marriage, or ripened into one. If they purposed matrimony they could have easily secured the license and the services of someone authorized to officiate while they were having prepared and acknowledging an instrument calculated to forestall any prosecution growing out of their journey together from Ohio to Florida. Certainly that was not the normal act of a bride and bridegroom. And if, as it has been urged, the simple secret agreement superseded this unusual document there was still opportunity for a ceremony before they started on their honeymoon.

Inasmuch as, according to appellant's testimony, no one but the deceased and she were present when they agreed to become husband and wife, he having died, she alone could tell of the incident.

This brings us to a discussion of her theory that two independent avenues of proof were open to her: she could establish the relationship "by direct evidence of making of the contract," or "by evidence that it was generally reputed in the community that she was married, plus evidence of cohabitation." Thus, she urges that a ceremony was shown and any testimony of repute became irrelevant. It is true that in our opinion in Le Blanc v. Yawn, *supra,* it was written that the "best evidence of such a marriage [per verba de praesenti, or by words of the same tense] would of course be the testimony of the contracting parties or those present when they mutually agreed to take each other as man and wife; but it may be established by what is termed habit or

repute." Further in support of her decision she cites 1 Jones' Commentaries on Evidence, 2nd Ed. Sec. 54, page 101, where it was said that a ceremonial marriage may not be disproved by evidence that the parties are reputed to be unmarried.

We are, therefore, importuned to hold not only that the private arrangement between them completely changed their status from illicit to lawful cohabitation but also that it be given the dignity of a formal ceremonial wedding. We apprehend that such an interpretation would work an injustice where the facts are like those with which we are dealing. A man dies; a woman thereupon claims that she and he privately, if not furtively, agreed to be husband and wife. He cannot be heard to deny her story. The testimony being uncontradicted the contract is established and repute becomes immaterial. It is difficult to imagine a readier vehicle of fraud. We think that such an arrangement as she detailed falls more appropriately in the class of clandestine relations, refuting presumption of marriage, Le Blanc v. Yawn, *supra*.

The Supreme Court of the United States, Travers v. Reinhardt, 205 U.S. 423, 51 L. Ed. 865, 27 S. Ct. 563 discussed at some length the essential features of a common-law marriage and the manner of proving them. There must be capacity and consent—this was held in Edge v. Rynearson, 107 Fla. 461, 145 So. 180—and the marriage need be followed by cohabitation. The court approved an announcement made by it in an earlier opinion that in the absence of ceremony or record "some public recognition of [the marriage] is necessary as evidence of its existence. The protection of the parties and their children and considerations of public policy require this public recognition; and it may be made in any way which can be seen and known by men, such as living together as man and wife, treating each other and speaking of each other in the presence of third parties as being in that relation. . . ."

It is patent that no distinction exists between the obligations and responsibilities of a marriage by ceremony and one consensuous, although there is a vast difference in origin or inception. Fundamentally, after the contract is made and consummated there is no occasion for any difference or dis-

tinction in the conduct of the parties whether they be united informally or by an elaborate ceremony in the most impressive surroundings. Any distinction develops when the relationship is questioned and then the matter resolves itself largely into one of proof. Those who have been wedded upon license and by an official or minister of the gospel may readily establish wedlock and their status cannot be successfully attacked by proof of repute that they are not in fact married. On the other hand, those who are joined together by the informal method may find it necessary to rely upon repute to establish the relationship because the real test of a union of this type is the actual representation to the public that the parties are husband and wife.

The rule evidently insisted upon by appellant has no application to the facts in this case because there was no true ceremonial wedding and if any marriage relationship at all existed between them it was a common-law union. Falling in that class the issue under the stipulation could not have been decided without inquiry into the manner in which they held themselves out to the public.

It seems to us that a just chancellor has wisely written *finis* to a sordid story before it was climaxed by a reward to a pretender.

Affirmed.

BUFORD, C. J., TERRELL, BROWN & SEBRING, JJ., concur.

ADAMS, J., concurs in conclusion.

CHAPMAN, J., not participating.