ELLIS, Judge.
This case was previously considered by this Court and judgment was rendered dismissing plaintiff’s suit on the ground that plaintiff’s contributory negligence barred his recovery. 55 So.2d 75. Writs were granted by the Supreme Court which resulted in a reversal of the judgment of this Court as the Supreme Court held the plaintiff was not guilty of contributory negligence and the case was remanded to this court for the following stated reasons:
“Being of the opinion that defendants have not established their special plea that plaintiff was contributorily negligent, there remains only for decision the questions respecting defendants’ liability, that is, whether the accident was caused solely by the negligence of Tullier, or that of Silvio, or by the concurring fault of both of them, and also the quantum of plaintiff’s damages. Since the Court of Appeal has not considered those issues, which primarily fall within its appellate jurisdiction, it is proper, even though not essential, that the case be remanded to that Court for their disposition. Mataya v. Delta Life Ins. Co., 222 La. 509, 62 So.2d 817 [No. 40-927 of the Docket, handed down on January 12th, 1953].” 222 La. 994, 64 So.2d 245, 251, handed down Feb. 16, 1953.
It is not necessary that the facts be rehashed in detail as they can readily be ascertained from the decree of this Court and of the Supreme Court, however, the Supreme Court has spoken in strong language as to the negligence of Tullier who was driving the pick up truck in which the plaintiff was a guest passenger at the time of the accident. It said:
“Prior to and at the time of the accident, the weather was inclement; it was sleeting intermittently and exceptionally cold. Because of these conditions, the Department of Highways had directed Silvio to spread salt over the paved roadways of the Mississippi River Bridge in order to prevent ice and sleet from accumulating thereon. When Tullier and plaintiff drove over the bridge on their journey into West Baton Rouge Parish, the north lane over which they travelled had already been salted by Silvio and his crew. During the salting operations, the Highway Department employees pla’ced warning signs lighted by flares -at each end of the bridge. There were two signs at each approach (the east and the west) stating ‘Men working on the Bridge — Drive Slow’ and ‘Icy Pavement.’ On the way over to the Country Club, Tullier observed the signs but did not encounter the highway *393 truck as it had already completed the salting of that roadway of the bridge.
“Tullier and plaintiff had been at the Country Club approximately an hour when they decided to return to East Baton Rouge. Meanwhile, sleet had been falling heavily and had covered the windshield of the pick-up truck while it was parked. Tullier and plaintiff removed the ice from the driver’s side of the windshield and, with his windshield wiper operating, Tullier was able to have good vision of the road ahead. On the return trip, both he and plaintiff, while they were upon the approach of the south lane of the bridge, observed the warning signs that had been placed thereon by Silvio and his crew.2 Tullier continued on at a speed of 30 to 35 miles an hour and, for some wholly unexplained reason,3 failed to see the Department of Highways truck, which had stopped at a point two-thirds of the distance upward on the western incline of the bridge, until he was about ten feet from it. At that time it was, of course, too late to avert an accident.
“2 However, plaintiff’s vision was much obscured by the accumulation of ice on his side of the windshield which had not been entirely removed because the mechanical wiper on that side of the windshield was out of order.
“3We say this because the evidence shows that, save for the defective windshield wiper on plaintiff’s side, the truck was in mechanical good order and its headlights were illuminating properly. In addition, the roadways of the bridge were lighted and a member of Silvio’s crew was stationed fifty feet in the rear of the Highway truck, flagging traffic to the left with a flashlight and handkerchief. Hence, but for the falling sleet, there was nothing to interfere with the driver’s vision and he says in his testimony ‘Under those general conditions it was as good as it was on a sunny day’.”
The negligence of Tullier is clearly established by the facts.
We next come to the question of whether or not Joseph Silvio, the operator of the Department of Highways truck, was guilty of negligence in stopping the truck on the bridge at night without visible taillights, in failing to place proper flares at the front and rear of the truck, and in parking the truck in such a position that sufficient clearance was not allowed for the safe passage of other traffic.
The lower court found that the failure of “Joseph Silvio, his crew, and the Department of Highways to substantially comply with the ‘flare’ law making it mandatory to have in place one lighted flare, reflector, or similar warning device at the site of a parked and standing truck just inside the black line marking the center of the paved highway, and place one lighted flare approximately 100 feet to the rear of said parked and standing truck, on the occasion in question herein, constitutes negligence which is also a proximate cause of said accident.”
The District Court held that John Duke, who was from thirty to fifty feet to the rear of the highway truck, flagging traffic with a flashlight, and a flag, was not a member of the highway crew, and that, therefore, Silvio did not, as a substitute for the failure to use flares as required by law, have anyone working in conjunction with him and his truck to protect and warn the traveling public against the parking of the said truck on the highway while salt was being thrown and spread on the east bound traffic lane of the Mississippi River Bridge. The preponderance of the testimony shows that whether Duke was employed by the Department of Highways or not, he was actually an estimated distance of from 30 to 35 feet to¡ the rear of the highway truck with a flashlight and a flag and had successfully flagged all other traffic except Tullier, and it is shown that Tullier evidently did not see or paid no attention whatsoever to Duke in his efforts to flag him around the highway truck with the flashlight and flag, for he didn’t slacken his speed and it was.necessary for Duke to jump to the pedestrian walk in order to prevent Tullier from running over him. In view of this established fact, together with the fact that the highway truck had head, tail and side lights burning and the bridge was lighted and the truck was being stopped only long enough *394 to scatter salt and then would move forward in order to scatter more salt, there was no negligence in its failure to place flares. The District Court found, as an additional ground of negligence, that the highway truck was parked at an angle so as to prevent the free passage of traffic to' its left and this constituted negligence. If this were a fact, any negligence in so stopping the truck was not a proximate cause of the accident, for Tullier did not see the truck until he was within 10 feet of it and could not have gone to the left even if it had been properly parked. The preponderance of the testimony, in fact, all of the eyewitnesses to the accident testified that the truck was properly parked in the south lane of the east bound traffic. The District Court relies upon the testimony of Tullier that he thought the truck was parked across the center line and the fact that the investigating officers found the right front of the truck parked close against the south side of the bridge, while the left rear end was close to or on the center line, however, the position of the truck as found by the troopers was most probably due to Tullier impulsively swerving to his left in a last desperate effort to avoid striking the truck which he should have easily seen in plenty of time to have avoided the collision. It appears logical that when Tullier struck the left rear end of the highway truck, as he swerved to his left he pulled the rear end of the truck to the center line.
The District Court also found that the highway truck was parked so that it did not leave a IS foot clearance for the passage of traffic. It must be remembered that there is a west bound traffic lane on the north side of the highway bridge which is approximately 20 feet in width that cares for all traffic traveling in a westerly direction and gives room for passing, and in the center is a railroad, and on the south is another twenty foot of pavement for east bound traffic. If we consider only the east bound traffic lane, it is impossible to park a motor vehicle so that there is IS feet of clearance to the north.
For the above reasons, we do not believe that S.ilvio is guilty of any negligence which was the proximate cause of the accident, and therefore, think the judgment should be rendered against the State Farm Mutual Automobile Insurance Company, the insurer of the Red Stick Tire and Supply Company, and plaintiff’s suit dismissed against Silvio and Great American «Indemnity Company.
 As to the quantum of damages, we find in a brief filed on behalf of State Farm Mutual Automobile Insurance Company the following:
“ * * * The amount awarded by the District Court for the damages, pain, and suffering and expenses was substantial and appears to be supported by the medical testimony and the authorities cited by the Trial Judge. However, the amount awarded for loss of income, twenty (20) weeks at $75.-00 per week, or a total of $1,500.00, is excessive. The only evidence submitted as to the- plaintiff’s loss of income was his own testimony, given at pps. 66, 67, 80, et seq., of the transcript of testimony. The plaintiff claimed to be a partner in the Oasis Bar and that he has invested the sum of $500.00 in cash, plus license fees, but on page 83 of the transcript, he finally admitted that he had no cash invested in the Bar but only a working agreement from the previous owner. White testified that he and his partner, Daigle, were drawing $75.00 per week each out of the Barroom which represented the approximate capital investment of $500.-00. We submit to the Court that White’s testimony in this particular is without any credibility and that the amount awarded for loss of earnings should be set aside as there is no proof by preponderance of the evidence as to what the plaintiff’s actual earnings were at the time of the accident.”
The District Court in its written reasons has clearly and correctly detailed the injuries suffered by the plaintiff as follows:
“The said Joseph Edward White was seriously and painfully hurt in said accident and received injuries resulting in a permanent disability to a significant degree to his body as a whole and *395 substantial loss of function and use of his right hip joint, right ankle' and right foot. A piece of bone was broken from the lip of White’s acetab-ulum or socket into which his hip joint fits, his right hip was dislocated and injured, the nerve controlling the use of his right foot was considerably damaged, there were cuts and bruises on his head, face and body. As White testified; ‘My head had gone through the windshield and my legs had hit in such a way that I knew I was injured, and I had to lay on the seat.’ White was operated on and treated by Dr. F. A. Dejean and Dr. I. L. George in the hospital and subsequently and without interruption their treatment was continued at a private home. Both Dr. Dejean and Dr. George testified that White was seriously injured and was permanently and substantially disabled in the manner indicated above and defendants offered no witness to refute or contradict their testimony. White was kept in traction in the hospital for several days and then placed in a body cast which started from the arm pits and covered right leg completely and just above the knee of the left leg. He left the hospital on or about February 28, 1949 with the cast still on to go to a private residence for economic reasons, was still unable to walk and remained in bed until about May 1, 1949. After getting out of the cast Dr. George had him use a cane for two weeks,' then a complete leg brace for 9 weeks, and then had him to continue using the leg brace cut down which he has been using ever since and was using at the time of the trial of this case on January 11, 1950. It is obvious that .White suffered much pain, considerable discomfort and inconvenience, lost much time, and suffered disabilities resulting in impairment of his earning' capacity as a result of the injury which he received in said accident. He also incurred medical, hospital and other necessary incidental expenses in a substantial amount. And at the time of the trial of this case, White was still wearing the brace mentioned and was disabled, and Dr. George testified that he felt that he should observe White at intervals over a period of about three more years,
“Now, the fee of expert witnesses herein should be and are hereby fixed at the sum and amount of Twenty Five & no/100 ($25.00) Dollars each.
“And considering all the facts and circumstances existing in this case, it. is the opinion of the Court that Plaintiff is entitled to damages herein as follows:
“1. Physical injuries and permanent disabilities and impairment of earning capacity resulting therefrom the sum of.$ 8,000.00
“2. Pain, suffering and mental anguish endured and to be endured, the sum of. 3,000.00
“3. Loss of earnings for at least 20 weeks at $75.00 per week, the sum of. 1,500.00
“4. Medical, hospital and other necessary incidental expenses as shown by itemized bills and testimony in the record, the sum of. 1,600.44
$14,100.44”
As to the $1,500 which was- awarded for •loss of income, we are of the opinion that plaintiff has failed to pro-ve such a loss, and that this amount should be disallowed, and that although counsel for plaintiff has answered the appeal and strenuously contends that the award should be increased, we believe that the award made by the District Court is approximately correct.
It is ordered that the judgment of the District Court be reversed by dismissing the suit of the plaintiff against Silvio and Great American Indemnity Company and that the award to the plaintiff be reduced by the sum of $1,500 and that in all other respects the judgment of the District Court be affirmed, costs to be paid by the defendants.