159 So.2d 544 (1964)
Juanita CHIVERS, Individually, etc., Plaintiff-Appellee,
v.
COUCH MOTOR LINES, INC. et al., Defendants-Appellants.
No. 1018.
Court of Appeal of Louisiana, Third Circuit.
January 15, 1964.
*547 Felix A. DeJean, Opelousas, now deceased, for defendants-appellants at the time of trial.
Lewis & Lewis, by Seth Lewis, Sr., Opelousas, for defendants-appellants on the appeal.
Sandoz & Sandoz, by Lawrence Sandoz, Jr., and Leslie Schiff, Opelousas, for plaintiff-appellee.
Before TATE, FRUGE and SAVOY, JJ.
TATE, Judge.
This is a wrongful death action. The defendants appeal from judgment awarding damages to the plaintiff.
On January 26, 1961, the decedent Chivers, a resident of Florida, was killed near Krotz Springs, Louisiana. He was struck by a truck-trailer owned and operated by Couch Motor Lines, Inc. The truck's driver and its insurer are joined with Couch as defendants.
The plaintiff brings this suit as the widow of a common-law marriage contracted with the decedent in the State of Florida. She sues to recover both for herself and also for the children of the union.
The principal issues of this appeal concern (1) the negligence of Couch's driver and (2) whether there was a valid common-law marriage between the plaintiff and the decedent Chivers.
1. Negligence.
The accident occurred shortly after midnight near the western end of the Atchafalaya River Bridge. It was cold at the time, and ice had formed on the roadway of the western incline of the long bridge.
The decedent Chivers was standing in front of a disabled vehicle and waving a flashlight to warn oncoming traffic. He was killed when the defendants' large freight-carrying truck skidded down the incline and crashed into the disabled vehicle.
Some five to ten minutes before the decedent Chivers was killed, a west-bound passenger vehicle driven by him had also skidded on the icy western incline. It turned completely around and lodged against the western railing, facing east in the westbound lane. This accident occurred at a time when Chivers was driving down the incline at a slow speed, but an attached U-Haul-It trailer swayed out and caused his vehicle to skid.
After this first accident, the Chivers vehicle could not be moved, due to the angle *548 and position of the trailer, which protruded a foot or two into the other (the eastbound) lane of the bridge roadway. Chivers and several others at the scene had first attempted unsuccessfully to straighten out the trailer.
Chivers then took out a flashlight and stationed himself some fifty feet or so in advance of the disabled vehicle, to warn oncoming traffic of the hazard. The parking lights and the inside dome light of his vehicle were also lit. Before the present accident, Chivers had thus guided one or two slow-moving westbound vehicles past his.
The trial court summarized the evidence concerning the defendant driver's negligence as follows:
"The evidence discloses that from the crest of the bridge to the western end of the bridge there is a distance of 665 feet and that the [Chivers's] station wagon was stalled some 60 feet from the western end of the bridge. There is no evidence that Chivers was guilty of any carelessness in driving the station wagon. The driver of the truck admitted to the state trooper that he was travelling approximately 40 miles an hour and that he first noticed the stalled vehicle some 250 feet from the point of impact. There were signs placed by the employees of the State Department of Highways warning drivers that there was ice on the bridge. The driver of the truck admitted that he saw the signs. From the truck driver's testimony it appears that he saw the stalled vehicle considerably more than 250 feet from the point of impact".
As a matter of fact, the defendant driver admitted that he saw the disabled vehicle, as well as three or four persons near it, as soon as he passed the crest of the bridge, some 600 feet distant from it.
The trial court correctly concluded that, under the circumstances shown, the sole proximate cause of the accident was the excessive speed of the driver of the Couch truck:
If the truck had not been operated at a speed excessive in view of the icy condition of the downward incline, the driver, upon observing the disabled vehicle some 600 feet ahead, had ample time either to stop and avoid the accident or else to veer slowly into the left lane, instead of losing control of his vehicle. The excessive speed contributed to the driver's losing control of his vehicle when he applied his brakes; his negligent speed is thus a proximate cause of the accident. Barret v. Caddo Transfer & Warehouse Co., Inc., 165 La. 1075, 1076, 116 So. 563, 58 A.L.R. 261; Schaubhut v. Liberty Mut. Ins. Co., La.App. 3 Cir., 157 So.2d 346, 347; Wright v. Home Indemnity Co., La.App. 2 Cir., 153 So.2d 213.
Further, considering that the decedent Chivers was making reasonable efforts to warn oncoming traffic of the obstruction caused by his disabled vehicle and that there was not time nor opportunity to remove it from the roadway before the present accident, the decedent was free of fault constituting a proximate contributory cause of the accident. Washington Fire & Marine Ins. Co. v. Canal Ins. Co., La.App. 1 Cir., 110 So.2d 231; Mouton v. Pacific Indemnity Co., La.App. 1 Cir., 102 So.2d 563; White v. State Farm Mut. Auto. Ins. Co., La.App. 1 Cir., 66 So.2d 391. The present facts are thus distinguished, as well as for other reasons, from those in the decision relied upon by appellants, Dixie Drive It Yourself System New Orleans Co. v. American Beverage Co., 242 La. 471, 137 So.2d 298, where the driver of the disabled vehicle was negligent because he made no attempt to warn oncoming traffic of the obstruction to traffic created by his vehicle.
2. The Plaintiff's Status as Surviving Wife of a Common-Law Marriage Contracted in Florida.
In Louisiana, the right to recover damages for wrongful death is created by statute, namely, LSA-Civil Code Article 2315. This right is granted to or survives in favor of statutorily-designated classes of *549 beneficiaries only. Jackson v. Lindlom, La. App.Orl., 84 So.2d 101, certiorari denied (discusses jurisprudence); cf. also: Board of Commissioners of Port of New Orleans v. City of New Orleans, 223 La. 199, 65 So. 2d 313; Manuel v. Carolina Cas. Ins. Co., La.App. 3 Cir., 136 So.2d 275.
The statutorily designated survivors with beneficiary rights include the widow and children of the decedent. LSA-C.C. Art. 2315. Not being expressly included, a bigamous wife or illegitimate children are not included within the statutory beneficiaries. Jackson v. Lindlom, cited above.
However, although common-law marriages contracted in Louisiana are not recognized as valid by the laws of our State, the Louisiana wrongful death statute does grant a remedy to the widow and children of a common-law marriage contracted in another state and recognized as valid therein. Gibbs v. Illinois Cent. R. Co., 169 La. 450, 125 So. 445. In such instance, the survivors are recognized as the legal spouse and legitimate children of the decedent, if the common-law marriage is valid under the laws of the state where contracted. Gibbs v. Illinois Central R. Co., cited above. See also: Brinson v. Brinson, 233 La. 417, 96 So.2d 653 (which notes a Louisiana public policy exception when the union is contracted in bad faith); Succession of Marinoni, 177 La. 592, 148 So. 888.
The defendants' able counsel strenuously insists, with citation of Florida decisions, that the union between the plaintiff and the decedent was in fact not a valid common-law marriage under the laws of Florida, where the union was contracted.
Nevertheless, we experience relatively little difficulty in agreeing with the trial court that the plaintiff is the surviving spouse, and her children the legitimate issue, of a valid common-law marriage contracted with the decedent in Florida, where the spouses lived together openly as man and wife for more than seven years.
We deem it advisable to discuss common-law marriages at greater length than is required by decision of the narrow issues as to the question before us, however, since to understand the issues raised it is necessary to set them in context of the general law concerning the question.
In the first place, as stated at 55 C.J.S. Marriage § 6, pp. 816-819:
"A common-law marriage may be briefly described as a marriage without formal solemnization, or without formalities. * * Where recognized, common-law marriages are as fully valid as ceremonial marriages * * *. [A] common-law marriage need not be solemnized; all that is required is that there should be an actual and mutual agreement to enter into a matrimonial relation * * * between parties capable in law of making such a contract * * * consummated by their cohabitation as man and wife or their mutual assumption openly of marital duties and obligations. * * *"
As we know, "* * * a common-law marriage cannot be contracted by virtue of the law of Louisiana. A so-called common-law marriage, entered into in Louisiana, is recognized merely as a state of concubinage." Succession of Marinoni, cited above, at 148 So. 894.
The parties to this suit concede that common-law marriages are, however, recognized in Florida.
With especial reference to the law of that State, "`To constitute a common-law marriage, at least two essentials must appear, mutual consent and capacity of the parties, and the agreement itself must be to become husband and wife immediately from the time when the mutual consent is given, which is known as words of present assent per verba de praesenti.'" Garcia v. Exchange Nat. Bank of Tampa, 123 Fla. 726, 167 So. 518, 520 (1930). "`To constitute marriage de verba de praesenti, the parties must be in the presence of each other when the agreement is entered into, *550 but it need not be made in the presence of a witness * * *. The parties may express the agreement by parol; they may signify it by whatever ceremony their whim or their taste or their religious belief may select; it is the agreement itself, and not the form in which it is couched, which constitutes the contract, and the words used or the ceremony performed are mere evidence of a present intention and agreement of the parties.'" Marsicano v. Marsicano, 79 Fla. 278, 84 So. 156, 158 (1920).
However, that the parties lived together and held themselves out as man and wife, does not establish a common-law marriage, Carretta v. Carretta, Fla., 58 So. 2d 439 (1952), nor does the circumstance that the parties lived together and later intended to solemnize their union by a valid marriage ceremony, Thompson v. Harris, 148 Fla. 329, 4 So.2d 385 (1941), Marsicano v. Marsicano, 79 Fla. 278, 84 So. 156 (1920)as stated in the latter case, an essential to the validity of such a marriage is "an agreement to become husband and wife immediately from the time when the mutual consent is given." 84 So. 158.
On the other hand, in the absence of proven incapacity, then the proof of a present agreement to live together as man and wife and of cohabitation and the general reputation thereafter of being married, establishes a prima facie case that there was a valid common-law marriage; and then the burden of proof that the marriage was invalid shifts to him who asserts its illegality. In re Colson's Estate, Fla., 72 So.2d 57 (1954); Lambrose v. Topham, Fla., 55 So.2d 557 (1951); In re Thompson's Estate, 145 Fla. 42, 199 So. 352 (1940); LeBlanc v. Yawn, 99 Fla. 328, 126 So. 789 (1930). As the latter three cases illustrate, the testimony of the surviving spouse alone may prove the marriage agreement (and, incidentally, where the proof of the marriage agreement is lacking or is denied, nevertheless "it may be established by what is termed habit or repute. In other words, proof of general repute and cohabitation as man and wife will support a presumption of marriage when the agreement is denied and cannot be proven by the best evidence [namely, the evidence of the parties themselves]." LeBlanc v. Yawn, cited above, at 126 So. 790).
For the sake of completeness, we should mention further that, when the living together first begins as a meretricious relationship, then it is presumed to continue as such, and the party relying upon the common-law marriage has the burden of showing the change in the relationship from concubinage. Jordan v. Jordan, Fla., 89 So.2d 22 (1956); McClish v. Rankin, 153 Fla. 324, 14 So.2d 714 (1943). There is no serious issue as to this in the present case, as the testimony does not show that the couple first lived together in concubinage before attempting to convert the relationship into a common-law marriage. (The Jordan v. Jordan decision, a divorce action, is also illustrative of the principle that, if there is a valid common-law marriage, it cannot thereafter be dissolved except in the same manner as a valid ceremonial marriagethe parties themselves, for instance, cannot dissolve it by an agreement to do so, or by a denial that it occurred, see 55 C.J.S. Marriage § 6, at p. 818.)
Reverting to the facts now before us in the present case:
The plaintiff testified that, after two months of friendship, she and the decedent "began living as man and wife" in August of 1953, Tr. 341, and thereafter "from the very beginning" held themselves out as man and wife. Tr. 313. She testified that, although they did not enter into a ceremonial marriage, they did enter into a common-law marriage. Tr. 184. She testified that at the time they had both been divorced from previous spouses. Tr. 340, 342. The decedent gave her a wedding ring, which she wore during the period of her marriage with the decedent Chivers. Tr. 342. She took the name of Chivers and was thereafter known by it.
*551 The plaintiff's testimony is corroborated by that of the decedent's parents. The uncontradicted testimony shows further:
The couple lived together thereafter as man and wife for seven years, all of the time in Florida except for about three months when they went together to Ohio for work. They recognized August 3rd as their anniversary date. Three children were born of the union, all of whom were registered and raised as lawful children of the marriage. Chivers was an affectionate father and spent much time with his wife and children. Chivers and the plaintiff bought a home together, visited frequently with Chivers's parents who lived nearby, and were considered as man and wife, going together to church and the movies, shopping together, etc. They filed joint income tax returns as man and wife. They publicly held themselves out to be married and were considered man and wife by all who knew them.
The facts in the present case are very similar to those in LeBlanc v. Yawn, 99 Fla. 328, 126 So. 789 (1930), where the Supreme Court of Florida held that a valid common-law marriage was adequately proved. The court stated that the evidence of the common-law wife was "sufficient to establish a common-law marriage. It is in effect that an agreement was made in the beginning to live together as man and wife, and that such an agreement was actually carried out by more than ten years of cohabitation as such." 126 So. 790.
We think that likewise the present common-law marriage was sufficiently proved.
To negate the validity of the marriage, able counsel for the defendants-appellants rely upon certain statements by the plaintiff in a discovery deposition to the effect that the couple intended later to go through a valid marriage ceremony. (This deposition was not introduced into evidence.) Counsel points out that under Marsicano v. Marsicano, 79 Fla. 278, 84 So. 156 (1920), parties who commence living together with the intention later of solemnizing their union by a marriage ceremony, do not contract a valid common-law marriage, since an essential element is a present agreement to live together thereafter as man and wife.
The Marsicano facts are distinguishable from the present, however. Here, the parties commenced living together under a present agreement to become man and wife and to live as such together thereafter. Although they talked from time to time of also having a ceremony, the plaintiff at the trial testified flatly that the reason they did not do so is that "We thought we were already married." Tr. 343. As stated in LeBlanc v. Yawn, cited above, with regard to similar facts: "It is true that a ceremonial marriage was discussed between them from time to time, but this fact alone is not inconsistent with the prior common-law marriage of these parties, nor does it overcome the presumption thereof arising from the evidence adduced." 126 So. 790.
Finally, counsel for the appellants suggests that the plaintiff did not adequately prove that she and the decedent had the capacity to contract the common-law marriage at the time it was entered into. Counsel suggests that the plaintiff did not adequately prove that she and the decedent had both been divorced from former spouses.
Under cross-examination, defendant's counsel elicited from the plaintiff that the decedent Chivers had been married previously, but she also replied to a question as to whether she knew he was divorced "It's so far back, I can't remember exact, if we had the divorce papers of his divorce yes, we did, yes." Tr. 340. Likewise, she testified positively that she had been divorced from her own former husband. Tr. 342.
Counsel suggests that certified copies of divorce decrees should have been introduced instead of this parol testimony to prove the divorces.
*552 It is to be observed that both the prior marriages and prior divorces were proved by parol evidence, without objection from either party. While perhaps under the best evidence rule an objection to proving the marriages and divorces by parol evidence might have been sustained, 32 C.J.S. Evidence §§ 803e. (marriage), 809a. (divorce), pp. 732, 738no objection was in fact made to proof of these facts by parol evidence. It is well settled that "A rule of evidence not invoked is waived, and hence a failure to object to evidence waives objections to its admissibility." 88 C.J.S. Trial § 115, p. 230. Cf. also, 32 C.J.S. Evidence § 863, p. 796. A failure to object to hearsay or secondary evidence when admitted at the trial constitutes a waiver of the right to object to its admissibility; such evidence may then be considered and given probative effect; and a party may not subsequently upon appeal urge that such evidence was actually inadmissible. Wainer v. Wainer, 210 La. 324, 22 So.2d 829, syllabus 5; Ardoin v. Southern Farm Bureau Cas. Ins. Co., La.App. 3 Cir., 150 So.2d 792, syllabus 2; Gray v. Great American Indemnity Co., La.App. 1 Cir., 121 So.2d 381, syllabi 1, 2.
Further, as stated in In re Thompson's Estate, 145 Fla. 42, 199 So. 352, 356 (1946), "The presumption of [Florida] law is that when people enter into a marriage contract, either ceremonial or of the common-law manner, they are competent and lawfully qualified to do so. * * * The burden to show incapacity was upon those who challenged the legality of the marriage."
For the foregoing reasons, we affirm the trial court's finding that the plaintiff has adequately proved that she and the decedent entered into a common-law marriage valid under the laws of Florida, where contracted. Accordingly, the plaintiff and her children are entitled to recover for the wrongful death of the decedent Chivers as his surviving spouse and legitimate children.
3. Discovery Depositions.
After the appeal was perfected and the record filed in this court, it was found that two discovery depositions were contained in the appellate record, which depositions had never been introduced into evidence. Accordingly, by motion in the trial court contradictory with defendants' counsel, the plaintiff secured an order from the trial court holding that the discovery motions had not been filed in evidence and should not properly be made part of the record. (Under LSA-C.C.P. Art. 2132, a trial court is not divested by the appeal of jurisdiction to correct errors or omissions in the appellate record. See also LSA-C.C.P. Art. 2088.)
In this court, counsel for the plaintiff-appellee has filed a motion to remove these discovery depositions from the record. The defendants-appellants have filed an opposition.
Subject to certain restrictions, discovery depositions may be introduced into evidence at the trial on the merits. LSA-C.C.P. Art. 1428. If introduced into evidence at the trial, counsel for either party may object to inadmissible evidence contained in the discovery deposition, LSA-C.C.P. Art. 1429, or may rebut any relevant evidence included in it, LSA-C.C.P. Art. 1430.
However, the trial or appellate courts cannot consider discovery depositions which were not introduced into evidence and as to which, consequently, opposing counsel have not had the opportunity to object to, rebut, or explain testimony contained therein. Chouest v. Remond, La. App. 1 Cir., 81 So.2d 568. The plaintiff-appellee's motion to remove the discovery depositions in question will therefore be granted, and they will be removed from the record and returned to the clerk of the trial court. Circello v. Haas & Haynie Corp., La.App. 1 Cir., 116 So.2d 144.
*553 4. Quantum.
The trial court awarded the plaintiff $12,500 as the decedent's spouse for the shock, sorrow, and mental pain caused her by the loss of her husband of nearly eight years and the father of her three children; no award was made to her, however, for loss of support or companionship, since the couple had separated four months prior to the decedent's death, and since the evidence indicated that the chances of reconciliation or of future support of the wife herself were not great (although the husband had been supporting his wife and children during the separation).
In addition, each of the couple's three childrenat the time of their father's death aged six years, four years, and two monthswere awarded $5000 for loss of their father's love and companionship, and the children were further awarded $8,000, $10,000 and $13,000 respectively for loss of their father's support.
The plaintiff by answer to the appeal argues that these awards should be increased. The defendant urges that they should be decreased or disallowed.
The Supreme Court has recently emphasized that the trial court's large discretion in the awards of general damages for personal injuries must not be disturbed on appellate review, in the absence of a clear abuse of it. Gaspard v. LeMaire, La., 158 So.2d 149 (Opinion on rehearing rendered November 12, 1963). We find none here.
Actually, giving weight to the differing factors of the present case, we find that the trial court awards for the death of this 28-year-old man, with an income of nearly four thousand dollars for the last year in which he had filed an income tax return (but employed in a trade which sustained periods of unemployments), are not inconsistent with those made, for instance, in Renz v. Texas and Pacific Railway Co., La.App. 3 Cir., 138 So.2d 114, Swillie v. General Motors Corp., La.App. 3 Cir., 133 So.2d 813, and Simon v. Texas and New Orleans Railroad Co., La.App. 3 Cir., 124 So.2d 646.

Decree.
For the foregoing reasons, the trial court judgment is affirmed at the cost of the defendants-appellants.
Affirmed.