998 So.2d 731 (2008)
Mrs. Tahereh GHASSEMI
v.
Hamid GHASSEMI.
No. 2007 CA 1927.
Court of Appeal of Louisiana, First Circuit.
October 15, 2008.
*733 Phil Breaux, St. Gabriel, LA, for Plaintiff/Appellant, Tahereh Ghassemi.
Mark D. Plaisance, Baker, LA, and Harry W. Ezim, Jr., Brian Prendergast, Wendy Edwards, Baton Rouge, LA, for Defendant/Appellee, Hamid Ghassemi.
Before PARRO, KUHN, and DOWNING, JJ.
KUHN, J.
Plaintiff appeals a judgment declining to recognize any Iranian marriage of the parties. For the detailed reasons that follow, we reverse the judgment and remand the matter for further proceedings consistent with the opinions expressed herein. Plaintiff also appeals three interlocutory judgments in this case. For reasons that follow, we affirm the interlocutory judgments.

FACTUAL AND PROCEDURAL HISTORY
Plaintiff, Tahereh Ghassemi, filed suit in the East Baton Rouge Parish Family Court (family court) seeking a divorce, spousal support, and a partition of community property. In her petition, she alleged that she and the defendant, Hamid Ghassemi, were married in Bam, Iran in 1976, at which time both parties were citizens of Iran. She further alleged that a son, Hamed, was born of their union in 1977. Ms. Ghassemi contends that in that same year, Mr. Ghassemi entered the United States (U.S.) on a student visa.[1] Ms. Ghassemi avers that when Mr. Ghassemi left Iran in 1977, it was with the understanding that he would return to Iran after he completed his studies or that he would arrange for her and Hamed to join him and establish a residence in the U.S. Unbeknownst to Ms. Ghassemi, after entering the U.S., Mr. Ghassemi contracted a "marriage" with an American woman, allegedly to enhance his legal status in this country. However, this purported "marriage" ultimately ended in "divorce."[2]
The petition further states that, in 1995, Mr. Ghassemi made the necessary applications that allowed Hamed to enter the U.S. as his "son."[3] However, no efforts were made on behalf of Ms. Ghassemi for her to *734 enter the U.S. Subsequently, in 2002, Mr. Ghassemi "married" yet another woman in Baton Rouge, Louisiana, where he had become domiciled.[4] In 2005, through the efforts of her son, Hamed, Ms. Ghassemi finally entered the U.S. as a permanent resident and also settled in Baton Rouge. On May 22, 2006, she filed the present suit.
Mr. Ghassemi responded by filing a peremptory exception pleading the objection of no cause of action. He argued that the purported marriage to Ms. Ghassemi was invalid for various reasons. Specifically, Mr. Ghassemi contended that the marriage was invalid pursuant to section (3) of Article 1045 of the Civil Code of the Islamic Republic of Iran,[5] which provides, in pertinent part, as follows:[6]
Marriage with the following relations by blood is forbidden, even if the relationship is based on mistake or adultery:
* * *
3  Marriage with the brother and sister and their children, or their descendants to whatever generation.
* * *
In his pleadings, Mr. Ghassemi posited several arguments in support of his contention that the marriage was invalid, the principal one being that he and Ms. Ghassemi are first cousins. Following a hearing, Mr. Ghassemi's exception was overruled, and the issue of the validity of the marriage was set for a trial on the merits on December 6, 2006, along with Ms. Ghassemi's petition for divorce.[7]
In the interim, Ms. Ghassemi sought to obtain, through discovery, financial information and a detailed descriptive list of the community property relative to her claims for spousal support and a partition of the community property. In response to Ms. Ghassemi's discovery request, Mr. Ghassemi *735 filed a motion to quash, and then filed a motion for a protective order and a motion to stay discovery regarding his personal and business financial information, until the family court made a determination as to whether the parties had been married and whether the marriage was valid in Louisiana. Shortly thereafter, Ms. Ghassemi filed a motion to compel regarding this same information. The opposing motions were entertained by the family court on August 29, 2006. Following the hearing, the family court granted Mr. Ghassemi's various motions and denied Ms. Ghassemi's motion to compel. Based upon the denial of Ms. Ghassemi's motion to compel, Mr. Ghassemi sought attorney fees and costs incurred in opposing the motion pursuant to LSA-C.C.P. art. 1469(4) and was subsequently awarded $1,500 in attorney fees.
During the course of the litigation, Mr. Ghassemi denied being Hamed's father. Consequently, Ms. Ghassemi filed a motion and order requesting a paternity test, which was met with Mr. Ghassemi's motion to quash. Mr. Ghassemi contended that the paternity of Hamed, now 29 years old, was irrelevant to Ms. Ghassemi's petition for divorce, spousal support, and partition of the community property. The family court ruled that it would hold this motion in abeyance until after the scheduled December trial.
On November 2, 2006, Mr. Ghassemi filed a pleading captioned, "Rule to Show Cause Why a Louisiana Court Should Have any Obligation, Under the Doctrine of Comity or Conflicts of Law, to Give Legal Effect to a Purported Incestuous Marriage of Iran, A Foreign Country With Which the United States Has No Diplomatic Relations and Motion for Declaratory Judgment with Incorporated Memorandum and Motion to Dismiss." Therein, he argued that Louisiana had no legal obligation to "give full legal effect" to a purported incestuous Iranian marriage. The matter was scheduled to be entertained on December 6, 2006, the date of the trial on the merits.
Ms. Ghassemi then filed a "Dilatory Exception of Unauthorized Use of Summary Proceedings and Objection to Request for Dismissal by Declaratory Judgment." Therein, she argued that pursuant to LSA-C.C.P. art. 926(A)(3), Mr. Ghassemi's rule and motion for a declaratory judgment constituted an unauthorized use of summary proceedings and that his request for the dismissal of her action via a declaratory judgment was impermissible. The matter was set for a hearing on December 5, 2006, the day before the scheduled trial.[8]
In his written opposition to the motion, Mr. Ghassemi argued that he intended to file a petition for a declaratory judgment but that it was inadvertently styled as a "motion." He further maintained that, out of an abundance of caution, a letter had been forwarded to Ms. Ghassemi's counsel advising of this mistake in captioning and stressing that the pleading was actually a "Petition for Declaratory Judgment." In addition, Mr. Ghassemi argued that because a declaratory judgment simply establishes the rights of the parties or expresses the opinion of the court on a question of law without ordering anything to be done, he also had included a "Rule to Show Cause and a Motion to Dismiss." According to Mr. Ghassemi, based on the content of the pleading, it was clearly "a *736 Petition for Declaratory Judgment" and "a Rule to Show Cause."
We note that the record lacks a transcription of the hearing and ruling on Ms. Ghassemi's exception and objection. Moreover, no judgment appears in the record, nor do the court minutes reflect any ruling by the family court; however, it is undisputed by the parties that the family court overruled and/or denied Ms. Ghassemi's exception and objection. Ms. Ghassemi also filed a motion seeking a continuance of the trial of Mr. Ghassemi's request for declaratory relief. This motion was likewise denied.
On December 6, 2006, when counsel for Mr. Ghassemi prepared to argue what was summarized as his "petition for declaratory judgment and motion to dismiss," Ms. Ghassemi re-urged her "exception or objection;" however, she failed to argue the matter any further. The family court then held a "trial" on Mr. Ghassemi's request for declaratory relief.[9] Therein, Mr. Ghassemi argued that a marriage between first cousins was a violation of a strong public policy of Louisiana and, further, that Louisiana had no obligation, under the doctrine of comity, to recognize Iranian law or to give legal effect to a marriage certificate issued by Iran.
At the conclusion of the trial, the family court stated:
This court exercising its powers vested from the state, this court will not recognize any document, decree, judgments[,] statutes or contracts, and will not give comity ... and no validity whatsoever from the country of Iran [s]ince that country has been declared by itself, and by its leader, to be an enemy of the United States. The United States has had no diplomatic relations with that country for 28 years, and they are not a signatory to the Hague Convention with respect to marriages. And even if the court recognizes the marriage, it will violate public policy of this state; and therefore the declaratory judgment is granted.
However, despite rendering this "initial" ruling from the bench, the family court later ordered the parties to submit post-trial memoranda.
Finally, on June 13, 2007, the family court issued written reasons and separately signed a final judgment, which contained the following decretal language:
IT IS ORDERED, ADJUDGED AND DECREED that this Court declines to recognize, will not recognize, and hereby declines to give full faith and credit to the laws, judgment, decrees, treaties' [sic] or pronouncements of the country of IRAN.[10]
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that this Court declines give [sic] comity and declines to recognize any laws, judgments, decrees, treaties' [sic] or legal pronouncement of the country of IRAN.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that this Court declines to recognize any IRANIAN purported incestuous marriage of the parties and hereby dismisses [Ms. Ghassemi's] petition with prejudice.
*737 Significantly, the judgment did not expressly state that the marriage was a violation of a strong public policy of this state.
From this judgment, Ms. Ghassemi now appeals. In so doing, she also challenges the interlocutory rulings made by the family court. We address first those assignments of error associated with the final judgment rendered in this case.

DISCUSSION

I. FINAL JUDGMENT
Initially, Ms. Ghassemi asserts several assignments of error as to the family court's procedural rulings relative to Mr. Ghassemi's request for declaratory relief and her exception and objection thereto. While at least some of these arguments appear to be potentially valid, we find we are hindered in our effort to address them due to an unclear and incomplete record.[11] However, we may pretermit any discussion of the procedural errors asserted by Ms. Ghassemi, as we find a substantive basis to reverse the family court's judgment.
At the trial of Mr. Ghassemi's request for declaratory relief, the parties stipulated as to the facts and presented only a question of law to the family court. Accordingly, we review the instant matter de novo. The sole issue before us is the same as that presented to the family court: whether an Iranian marriage between first cousins will be recognized in Louisiana.

A. Applicable Law
It is axiomatic that our analysis begins with an examination of the pertinent provisions governing the conflict of laws. Marriage and, specifically, the validity of marriages are topics that, traditionally, have been subsumed under the rubric of status. LSA-C.C. art. 3519, comment (a). Louisiana Civil Code article 3519, which addresses the status of persons, provides as follows:
The status of a natural person and the incidents and effects of that status are governed by the law of the state whose policies would be most seriously impaired if its law were not applied to the particular issue.
That state is determined by evaluating the strength and pertinence of the *738 relevant policies of the involved states in the light of: (1) the relationship of each state, at any pertinent time, to the dispute, the parties, and the person whose status is at issue; (2) the policies referred to in Article 3515; and (3) the policies of sustaining the validity of obligations voluntarily undertaken, of protecting children, minors, and others in need of protection, and of preserving family values and stability.
However, Article 3519 only applies to the validity of marriages that do not fall within the ambit of LSA-C.C. art. 3520. LSA-C.C. art. 3519, comment (a). Article 3520, which is more specific, addresses the validity of marriages that are valid in the state where they were contracted or in the state where the parties were first domiciled. Article 3520 purposefully does not encompass marriages that are not valid in either of these states, the validity or invalidity of which must be analyzed under LSA-C.C. art. 3519.[12]See LSA-C.C. art. 3520, comment (a). Specifically, Article 3520 provides:
A. A marriage that is valid in the state where contracted, or in the state where the parties were first domiciled as husband and wife, shall be treated as a valid marriage unless to do so would violate a strong public policy of the state whose law is applicable to the particular issue under Article 3519.
B. A purported marriage between persons of the same sex violates a strong public policy of the state of Louisiana and such a marriage contracted in another state shall not be recognized in this state for any purpose, including the assertion of any right or claim as a result of the purported marriage.
Comment (b) to Article 3520 explains our state's longstanding policy of "favor matrimonii." Specifically, it provides, in part, as follows:
Based on the universally espoused policy of favoring the validity of marriages if there is any reasonable basis for doing so (favor matrimonii), this Article authorizes the validation of marriages that are valid either in the state where contracted or in the state where the spouses were first domiciled as husband and wife.... This ancient policy of favor matrimonii and favor validatis is well entrenched in the substantive law of every state of the United States. This policy is equally important at the multistate level, where it is reenforced by the policy of avoiding "limping marriages". This Article enunciates this policy of validation and defines its limits. These limits are co-extensive with the "strong public policy of the state whose law is applicable to the particular issue under Article 3519." In order to rebut the presumptive rule of validation established by Article 3520, the party who asserts the invalidity of the marriage must prove that: (1) under Article 3519, the law of a state other than the one where the marriage was contracted or where the parties were first domiciled as husband and wife would be applicable to the particular issue; and (2) that law would invalidate the marriage for reasons of "a strong public policy".
Thus, it is the public policy of Louisiana that every effort be made to uphold the validity of marriages. See Wilkinson v. Wilkinson, 323 So.2d 120, 124 (La.1975). *739 Moreover, if a foreign marriage[13] is valid in the state where it was contracted, the marriage is accorded a presumption of validity.
In seeking declaratory relief, Mr. Ghassemi did not argue that a marriage between first cousins is invalid in Iran, where the marriage herein was purportedly contracted. Moreover, we conclude that such a marriage is not prohibited by the Iranian Civil Code article previously cited by Mr. Ghassemi in his peremptory exception pleading the objection of no cause of action. Accordingly, LSA-C.C. art. 3520 is controlling herein, and such a marriage is presumed to be valid. To defeat this presumption, Mr. Ghassemi must prove that the law of another state is applicable and that state's law would invalidate the marriage for reasons of "a strong public policy."
Because both he and Ms. Ghassemi are now domiciled in Louisiana, presumably with no intention of returning to Iran, and because Ms. Ghassemi has sought a divorce in the courts of this state, Mr. Ghassemi essentially argued that Louisiana law would be applicable under LSA-C.C. art. 3519 and asserted, to a considerable extent, that the marriage violates a strong public policy of Louisiana.
However, the majority of Mr. Ghassemi's argument in the underlying proceedings was premised on his assertion that the family court had no obligation under the doctrine of comity[14] either to recognize (1) a marriage certificate issued by Iran or (2) the laws of Iran where the purported marriage was contracted. In so doing, Mr. Ghassemi argued, in essence, that the family court could not or should not consider whether the marriage was valid under Iranian law. Based upon its judgment, the family court clearly credited this argument and, relying on the doctrine of comity, essentially based its decision not to recognize the purported marriage in light of the state of diplomatic relations between Iran and the U.S.[15]
However, as the parties now agree, the family court's discussion of comity and the U.S.'s diplomatic relations with Iran, or lack thereof, is irrelevant to the matter at hand.[16] Clearly, the positive law set forth in LSA-C.C. art. 3520 is controlling herein and provides the correct standard for a court to utilize in determining the validity of this foreign marriage. Thus, we find that the family court failed to enunciate the appropriate legal standard and further failed to analyze the precise *740 issue before it within the parameters of that standard.[17] The proper legal standard simply requires a two-part inquiry:
(1) Was the marriage valid in the state (Iran) where it was purportedly contracted?
(2) If so, would recognition of the validity of the marriage violate "a strong public policy" of the state whose law would be applicable under LSA-C.C. art. 3519 (Louisiana)?[18]

B. Valid in the state where contracted?
In his brief to this court, Mr. Ghassemi concedes, for the sake of argument, that a marriage between first cousins is valid under Iranian law. Nevertheless, the family court, relying on the doctrine of comity, refused to consider whether such a marriage was valid in Iran. Or, to be more precise, the family court essentially refused to acknowledge the existence of any marriage contracted in Iran.
Specifically, the family court ruled that it would not give effect to the laws of Iran and/or a marriage document issued by Iran under the doctrine of comity.[19] However, this is not a matter of enforcing Iranian law in Louisiana or giving automatic legal effect to an Iranian marriage certificate. To the contrary, this matter is squarely controlled by Louisiana law. Our legislature has expressly provided that a marriage valid where contracted will be recognized as valid in Louisiana absent a violation of strong public policy. Given its judgment, it is clear that the family court failed to recognize that determining whether a foreign marriage is valid where contracted  as required by Louisiana law does not equate to enforcing a foreign law here. The family court likewise failed to appreciate the distinction between acknowledging that a foreign document is what it purports to be and blindly enforcing or giving legal effect to that document.
Furthermore, insofar as the family court indicated that Ms. Ghassemi would be unable to prove the existence of the marriage because, under the doctrine of comity, it would not allow the admission of, or allot any validity to, the marriage certificate issued in Iran, it was in error.[20] While such a document is not entitled to be given legal effect, it is certainly relevant in determining whether a marriage occurred, where it occurred, and whether it was valid where it was confected.
*741 Moreover, the Louisiana Code of Evidence, not the doctrine of comity, governs the admission of the document. See generally LSA-C.E. art. 901 et seq. Articles 902-905 of the Code of Evidence provide broad authority for the admission of public records of foreign countries, and specify how such documents may be authenticated. See LSA-C.E. art. 901, comment (f) to paragraph B. In particular, LSA-C.E. art. 902, which addresses self-authentication, provides, in part, as follows:
Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to the following:
* * *
(3) Foreign public documents. A document purporting to be executed or attested in his official capacity by a person authorized by the laws of a foreign country to make the execution or attestation, and accompanied by a final certification as to the genuineness of the signature and official position (a) of the executing or attesting person, or (b) of any foreign official whose certificate of genuineness of signature and official position relates to the execution or attestation or is in a chain of certificates of genuineness of signature and official position relating to the execution or attestation. A final certification may be made by a secretary of embassy or legation, consul general, consul, vice consul, or consular agent of the United States, or a diplomatic or consular official of the foreign country assigned or accredited to the United States. If reasonable opportunity has been given to all parties to investigate the authenticity and accuracy of official documents, the court may, for good cause shown, order that they be treated as presumptively authentic without final certification or permit them to be evidenced by an attested summary with or without final certification.
To the extent that Mr. Ghassemi argued that the fact that Iran is not a signatory to the "Hague Convention of 5 October 1961 Abolishing the Requirement of Legalization for Foreign Public Documents" precludes the family court from admitting the marriage certificate into evidence, we find his argument to be wholly misguided. That Convention merely simplifies the legalization process for signatories by abolishing the cumbersome requirement of diplomatic or consular legalization of foreign public documents. Thus, under the Convention, a contracting state where a foreign document is to be used may not demand that the document be certified by its diplomatic or consular agent stationed in the contracting state where the document was generated. It therefore follows that those countries that are not parties to the Convention must still have such documents properly authenticated via the diplomatic or consular legalization process, the very procedure called for under LSA-C.E. art. 902(3).[21]
At the trial of his request for declaratory relief, Mr. Ghassemi argued that because the U.S. has no diplomatic relations with Iran, the document cannot be certified in accordance with Article 902(3). However, this is incorrect. Article 902(3) expressly states that a foreign document may be certified by "a diplomatic or consular official of the foreign country assigned or accredited to the United States." After *742 the U.S. severed relations with Iran in 1980, the U.S. requested that the Swiss Government assume diplomatic and consular representation of the U.S. in Iran.[22] Consequently, the Swiss Embassy in Tehran, which houses the U.S. Interests Section, now performs specific consular and administrative functions on behalf of the U.S. Government, including the certification of Iranian public documents for their use in this country, a situation clearly contemplated by Article 902(3).[23] Even so, the last clause of Article 902(3) establishes that the courts are afforded considerable discretion in the authentication of foreign public documents and consequently may consider such documents presumptively authentic even without this final certification.
Based on all of the foregoing precepts, we find that the family court erred in declaring that it would not recognize any Iranian laws and/or Iranian documents, and, consequently, would not recognize any marriage contracted in Iran.[24] Moreover, there was absolutely no evidence, much less an assertion, that Iranian law prohibits marriage between first cousins; as we have concluded, such a marriage is not prohibited under the pertinent Iranian code article. Because a marriage between first cousins is valid in Iran, it is accorded the presumption of validity. Accordingly, it was error for the family court not to recognize the validity of first-cousin marriages under Iranian law when rendering its judgment.

C. Violation of a strong public policy?
If a marriage is valid where contracted, it is presumed to be valid in this state. To rebut that presumption in the case sub judice, Mr. Ghassemi must prove that the recognition of a foreign marriage between first cousins would violate "a strong public policy" of this state.
Clearly, in determining whether Louisiana has "a strong public policy" against recognizing the validity of a foreign marriage between first cousins, it is appropriate to examine our laws governing marriages that are contracted in this state. Louisiana Civil Code article 90, which addresses the impediments of relationships, provides as follows:
A. The following persons may not contract marriage with each other:
(1) Ascendants and descendants.
(2) Collaterals within the fourth degree, whether of the whole or of the half blood.
B. The impediment exists whether the persons are related by consanguinity or by adoption. Nevertheless, persons related by adoption, though not by blood, in the collateral line within the fourth degree may marry each other if they obtain judicial authorization in writing to do so.
The phrase "collaterals within the fourth degree" includes aunt and nephew, uncle and niece, siblings, and first cousins. LSA-C.C. art. 90, comment (b); see also LSA-C.C. art. 901. Pursuant to LSA-C.C. art. 94, a marriage is absolutely null *743 when contracted in this state (1) without a marriage ceremony, (2) by procuration, or (3) in violation of an impediment.
However, the mere fact that a marriage is absolutely null when contracted in Louisiana does not mean that such a marriage validly performed elsewhere is automatically invalid as violative of a strong public policy. For example, comment (b) to LSA-C.C. art. 3520 expressly states, in part: "The word `contracted' as opposed to the word `celebrated' is used [in this article] so as not to exclude common-law marriage from the scope of this Article." A common-law marriage is one that is performed without a ceremony. See Succession of Marinoni, 177 La. 592, 613, 148 So. 888, 895 (1933); Chivers v. Couch Motor Lines, Inc., 159 So.2d 544, 549 (La. App. 3 Cir.1964); see also BLACK'S LAW DICTIONARY 277 (6thed.1990) (defining a common-law marriage as "non-ceremonial"). Based on the language in comment (b), LSA-C.C. art. 3520 was clearly intended to encompass foreign common-law marriages, i.e., marriages contracted without a ceremony, even though such a marriage contracted in Louisiana is absolutely null.
Indeed, the jurisprudence is replete with decisions recognizing that if a common-law marriage is contracted in a state whose law sanctions such a marriage, the marriage will be recognized as a valid marriage in Louisiana, even though a common-law marriage cannot be contracted in this state. See, e.g., Brinson v. Brinson, 233 La. 417, 425, 96 So.2d 653, 656 (1957); Bloom v. Willis, 221 La. 803, 807, 60 So.2d 415, 417 (1952), cert. denied, 345 U.S. 916, 73 S.Ct. 726, 97 L.Ed. 1349 (1953); Succession of Marinoni, 177 La. at 610, 148 So. at 894; Gibbs v. Illinois Cent. R. Co., 169 La. 450, 453-54, 125 So. 445, 446 (1929); Lewis v. Taylor, 554 So.2d 158, 159 n. 1 (La.App. 2 Cir.1989), writ denied, 554 So.2d 1237 (La.1990); Succession of Rodgers, 499 So.2d 492, 495 (La.App. 2 Cir. 1986); Fritsche v. Vermilion Parish Hosp. Service Dist. No. 2, XXXX-XXXX, p. 3 (La. App. 3 Cir. 2/2/05), 893 So.2d 935, 937-38, writs denied, XXXX-XXXX and XXXX-XXXX (La.4/22/05), 899 So.2d 574 and 576; State v. Williams, 96-652, p. 6 (La.App. 3 Cir. 2/5/97), 688 So.2d 1277, 1281; Parish v. Minvielle, 217 So.2d 684, 688 (La.App. 3 Cir.1969); Chivers, 159 So.2d at 549. See also LSA-C.C. art. 87, comment (d).
Similarly, this state has recognized a foreign marriage contracted by procuration, even though such a marriage would be absolutely null if contracted here.[25] In U.S. ex rel. Modianos v. Tuttle, 12 F.2d 927 (E.D.La.1925), the court held that the statute prohibiting marriage by procuration only applied to marriages contracted within Louisiana and that the marriage of a citizen celebrated by proxy in Turkey was valid where it was valid under the laws of that country.
There is no Louisiana jurisprudence addressing the recognition of a foreign marriage between first cousins; however, based on the law of this state, presently and historically, we find that such a marriage, if valid where contracted, is valid in Louisiana and is not a violation of a strong public policy.[26] In finding no violation, we make a clear distinction *744 between the marriage of first cousins and marriages contracted by more closely-related collaterals, i.e., uncle and niece, aunt and nephew, and siblings.
Contrary to assertions made by defense counsel to the family court, marriage between first cousins has not always been prohibited in Louisiana. It was permitted under the Civil Codes of 1804, 1808, and 1825. It was also permitted under the Civil Code of 1870 until its amendment in 1902.[27]
Prior to its amendment in 1902, Article 95 of the Civil Code of 1870 (the source of present LSA-C.C. art. 90) provided, as follows:
Among collateral relations, marriage is prohibited between brother and sister, whether of the whole or of the half blood, whether legitimate or illegitimate, and also between the uncle and the niece, the aunt and the nephew.
It was then amended by 1902 La. Acts, No. 9, to provide, in part, as follows:
Among collateral relations, marriage is prohibited between brother and sister, whether of the whole or the half blood, whether legitimate or illegitimate, between uncle and niece, between aunt and nephew, and also between first cousins.
That no marriage contracted in contravention of the above provisions in another State by citizens of this State, without first having acquired a domicile out of this State, shall have any legal effect in this State.[28]
Thus, prior to 1902, there was absolutely no bar to marriages between first cousins in this state.
Even so, notwithstanding the prohibitions set forth in former Article 95 (as amended in 1902), the Louisiana Legislature thereafter repeatedly ratified marriages between collaterals in the fourth degree that had been contracted in violation of the prohibition. See 1972 La. Acts, No. 230, and 1981 La. Acts, No. 647. Effective September 11, 1981, former Article 95 was amended by 1981 La. Acts, No. 647, to provide as follows:
Among collateral relations, marriage is prohibited between brother and sister, whether of the whole or the half blood, whether legitimate or illegitimate, between uncle and niece, between aunt and nephew, and also between first cousins.
No marriage contracted in contravention of the above provisions in another state by citizens of this state, without first having acquired a domicile out of this state, shall have any legal effect in this State.
AH such marriages heretofore made in contravention of the above provisions shall be considered as legal. (Emphasis added.)
Hence, the Louisiana Legislature legalized all marriages between collaterals within the fourth degree that were contracted by citizens of this state before September 11, 1981.
In a similar vein, Article 113 of the Civil Code of 1870 was amended by 1904 La. Acts, No. 129:

*745 Every marriage contracted under the other incapacities or nullities enumerated in the second chapter of this title, may be impeached either by the married persons themselves, or any person interested, or by the Attorney General; however, first, that marriages heretofore contracted between persons, related within the prohibited degrees either or both of whom were then and afterward domiciled in this State and were prohibited from intermarrying here, shall nevertheless be deemed valid in this State, where such marriages were celebrated in other States or countries under the laws of which they were not prohibited; second, that marriages hereinafter contracted between persons, either or both of whom are domiciled in this State and are forbidden to intermarry, shall not be deemed valid in this State, because contracted in another State or country where such marriages are not prohibited, if the parties, after such marriage, return to reside permanently in this State.
Obviously, the amendment was intended to ratify prior "fugitive marriages"[29] but to henceforth prevent Louisiana domiciliaries from thwarting the law of this state by contracting such marriages. However, despite the express intention to prevent future fugitive marriages, the Louisiana Legislature thereafter periodically amended and reenacted former Article 113, employing essentially the same language utilized in 1904 La. Acts, No. 129. See 1912 La. Acts, No. 54; 1938 La. Acts, No. 426; and 1950 La. Acts, No. 242. Thus, fugitive marriages contracted by collaterals were periodically ratified.
In continually ratifying marriages between collaterals within the fourth degree, notwithstanding our law's express prohibition of such marriages, the legislature voluntarily chose to legalize marriages by Louisiana domiciliaries who had chosen either to ignore Louisiana law or flout it. See Katherine Shaw Spaht, Revision of the Law of Marriage: One Baby Step Forward, 48 La.L.Rev. 1131, 1139-40 (1988).
The general practice of retroactively validating prohibited marriages between collaterals only ended when 1987 La. Acts, No. 886, was enacted to revise the Civil Code articles relative to marriage. In addition to redesignating former Articles 95 and 113 as present Articles 90 and 94 respectively, that Act expressly protects those collaterals whose marriages previously had been declared legal pursuant to 1981 La. Acts, No. 647, but further evidences an intention not to continue the practice of retroactively validating such marriages. See Spaht, 48 La.L.Rev. at 1148. Specifically, Section 5 of 1987 La. Acts, No. 886, provides:
Notwithstanding the provisions of Civil Code Articles 90 and 94, or of any other provision of this Act, marriages between collateral relations contracted prior to September 11, 1981, shall continue *746 to be legal and of full effect on or after the effective date of this Act.
The foregoing is noted in comment (b) to present LSA-C.C. art. 90, which likewise states:
Marriages contracted by these collaterals before September 11, 1981, were legal under former Civil Code Article 95 as retroactively amended by Acts 1981, No. 647. Though not continued as part of the Civil Code, that validating provision has been carried forward in Section 5 of the act embodying this revision (Acts 1987, No. 886).
Furthermore, as a result of the amendments and reenactments set forth in 1987 La. Acts, No. 886, LSA-C.C. art. 94, comment (d) now reads as follows:
The retrospective provision of Article 113 of the Civil Code of 1870 concerning "fugitive marriages" has been suppressed in this revision. However, in order to protect the interests of persons who have relied on the most recent such exception, a section of the act embodying this revision (Acts 1987, No. 886, § 5) retroactively validates all marriages between collateral relations contracted prior to September 11, 1981, the effective date of Acts 1981, No. 647 (which similarly amended Article 95 of the Civil Code of 1870).
The prospective fugitive marriage provision of Civil Code Article 113 (1870) has also been suppressed because it is unnecessary. The only situation it addressed is that in which Louisiana domiciliaries who lack capacity to marry in this state contract marriage in another state or country and then return here to live, intending to remain here. In that case the second paragraph of Civil Code Article 10 (1870) (redesignated as Art. 15 in 1987 [subsequently revised; see, now, C.C. art. 3520]) applies, and is dispositive.
There is no reason to apply a different rule to a fugitive marriage performed in another state, rather than a foreign country.[30] (Emphasis added; footnote added.)
Thus, a marriage contracted in another country or state now must be analyzed without making any distinction as to the parties' domiciliary status at the time the marriage is contracted. Accordingly, a marriage contracted in another state or country where such a marriage is valid is to be analyzed pursuant to LSA-C.C. art. 3520 regardless of whether a person is a domiciliary of Louisiana or of another state or country.
Although no "general" ratifications have occurred since 1981, in 1993, the legislature enacted LSA-R.S. 9:211, which currently provides:
Notwithstanding the provisions of Civil Code Article 90, marriages between collaterals within the fourth degree, fifty-five years of age or older, which were entered into on or before December 31, 1992, shall be considered legal and the enactment hereof shall in no way impair vested property rights.
*747 In light of all of the foregoing, and for reasons more fully explained below, we are compelled to conclude that Louisiana does not have a strong public policy against recognizing a marriage between first cousins performed in a state or country where such marriages are valid.[31]
Clearly, if Louisiana law were applied to the marriage at issue herein, it would be valid, since all marriages contracted by collaterals within the fourth degree before September 11, 1981, are legal. Thus, assuming the purported marriage herein was not valid under Iranian law, and that LSA-C.C. art. 3519 mandated the application of Louisiana law, the 1976 marriage would be valid. There is no reason a different result should obtain under LSA-C.C. art. 3520 simply because the marriage was valid in Iran.
Nevertheless, in an effort to discount the history of legislative ratifications and argue that a strong public policy in Louisiana absolutely prohibits a marriage between first cousins, Mr. Ghassemi argues that the ratification of all marriages between collaterals contracted prior to September 11, 1981, was merely intended to benefit those collaterals who were Louisiana domiciliaries when the marriage occurred and was not meant to benefit those who married before making Louisiana their domicile. We find this argument to be contrary to logic and justice. If the Louisiana legislature recognized marriages between collaterals within the fourth degree who were Louisiana domiciliaries and who had intentionally ignored or thwarted Louisiana law in order to contract their marriages, then, a fortiori, it would certainly recognize marriages legally contracted by collaterals who, before becoming domiciled here, were domiciled and married in a state or country that permitted such marriages. Moreover, all marriages contracted outside of Louisiana now are analyzed pursuant to either LSA-C.C. art. 3519 or 3520, regardless of whether the parties were domiciliaries of Louisiana or another jurisdiction at the time the marriage occurred. Hence, his attempt to urge the application of a distinction based on domiciliary status fails on this basis as well. Accordingly, we find Mr. Ghassemi's argument to be without merit.
However, we emphasize that the instant case involves the marriage of first cousins. Although the previously noted laws, both past and present, applied generally to all collaterals within the fourth degree, we reiterate that in finding no violation of a strong public policy, we make a clear *748 distinction between the marriage of first cousins and marriages contracted between more closely-related collaterals. While the former is commonly accepted, the latter is greatly condemned.
"The marriage of first cousins has historically been regarded as in a different category from that of persons more closely related." 52 Am.Jur.2d, Marriage § 51. A marriage between first cousins neither violates natural law[32] nor is it included in the wider list of prohibited relationships set forth in Chapter 18 of the Bible's Book of Leviticus, the font of Western incest laws. P.H. Vartanian, Annotation, Recognition of Foreign Marriage as Affected by Policy in Respect of Incestuous Marriages, 117 A.L.R. 186, 190 (1938).
Thus, while "incestuous" marriages have traditionally constituted an exception to the general rule that a marriage valid where contracted is valid everywhere, that historical exception excludes marriages contracted between first cousins. See Id.; Mark Strasser, Unity, Sovereignty, and the Interstate Recognition of Marriage, 102 W.Va.L.Rev. 393, 405 (1999). See also Succession of Gabisso, 119 La. 704, 713, 44 So. 438, 441 (1907) (recognizing the incest exception).
Our recognition of this distinction is further buttressed by the fact that relations between first cousins are not encompassed by our criminal incest statute, LSA-R.S. 14:78, which provides, in pertinent part:
A. Incest is the marriage to, or sexual intercourse with, any ascendant or descendant, brother or sister, uncle or niece, aunt or nephew, with knowledge of their relationship.
Some U.S. states that prohibit first-cousin marriages, including states that consider such marriages void if contracted within the state, have nonetheless recognized such marriages when validly celebrated elsewhere by relying largely on the fact that their respective legislatures had not seen fit to criminalize relations between first cousins, despite prohibiting them from marrying within the state. See Matter of Loughmiller Estate, 229 Kan. 584, 590, 629 P.2d 156, 161 (1981) (discussing how the prohibition against first cousin marriages has become less compelling as evidenced by the legislature's omission of sexual intercourse between first cousins in the definition of criminal incest); Mazzolini v. Mazzolini, 168 Ohio St. 357, 359-60, 155 N.E.2d 206, 208 (1958) (wherein the court relied on the fact that sexual relations between first cousins was not deemed incestuous under criminal statute); see also, Matter of Hirabayashi, 10 I. & N. Dec. 722, 724 (1964) (noting that a strong public policy did not exist against marriages between first cousins since cohabitation between first cousins was no longer considered a crime under Illinois statutes). Based upon the law of Louisiana, first cousins may legally cohabitate, have intimate relations, and even produce children; however, they are merely prohibited from regularizing their union by marriage. This disparity would tend to negate any contention that Louisiana has a strong public policy against marriages between first cousins, since it is in conflict with this state's policy to legally solidify such unions for the good of society at large and for the benefit of any potential posterity.
Furthermore, we note that marriages between first cousins are widely permitted *749 within the western world. "Such marriages were not forbidden at common law." 52 Am.Jur.2d, Marriage § 51. Additionally, no European country prohibits marriages between first cousins. See Martin Oppenheimer, FORBIDDEN RELATIVES: THE AMERICAN MYTH OF COUSIN MARRIAGE, 90 (1996); Ann Laquer Estin, Embracing Tradition: Pluralism in American Family Law, 63 Md. L.Rev. 540, 564 (2004). Marriages between first cousins are also legal in Mexico and Canada, in addition to many other countries. See Código Civil Federal [C.C.F.] [Federal Civil Code], as amended, Articulo 156, Diario Oficial de la Federación [D.O.], 12 de Diciembre de 2004 (Mex.); The Marriage (Prohibited Degrees) Act, 1990 S.C., ch.46 (Can.); § 155 of the Canadian Criminal Code.
Actually, the U.S. is unique among western countries in restricting first cousin marriages. Even so, such marriages may be legally contracted in Alabama, Alaska, California, Colorado, Connecticut, Florida, Georgia, Hawaii, Maryland, Massachusetts, New Jersey, New Mexico, New York, North Carolina,[33] Rhode Island, South Carolina, Tennessee, Vermont, Virginia, and the District of Columbia.[34] An additional six states, Arizona, Illinois, Indiana, Maine, Utah, and Wisconsin, also allow first cousin marriages subject to certain restrictions.[35]
Accordingly, Louisiana is one of only 25 U.S. states that flatly prohibits such marriages. However, even other states that prohibit marriages between first cousins, have nonetheless found that such marriages do not violate public policy and thus recognize such marriages as valid, if they are valid in the state or country where they were contracted. See Etheridge v. Shaddock, 288 Ark. 481, 482-83, 706 S.W.2d 395, 396 (1986) (where Arkansas court cited Robert A. Leflar, AMERICAN CONFLICTS LAW, § 221 (3d ed.1977), for the proposition that the marriage of first cousins "does not create `much social alarm'" and found that such a marriage will be recognized, if valid where contracted, despite Arkansas' prohibition against such marriages); Matter of Loughmiller Estate, 229 Kan. at 590, 629 P.2d at 161 (1981) (where Kansas court found that the marriage of first cousins contracted in Colorado was not "odious to the public policy" of Kansas and would be recognized as valid, notwithstanding Kansas' prohibition of first cousin marriages); Toth v. Toth, 50 Mich.App. 150, 151-52, 212 N.W.2d 812, 813 (1973) (per curiam) (where Michigan court found marriage between first-degree cousins married in Hungary was valid); Raja v. Raja, 54 Pa. D. & C.2d 72, 73-74 (Pa.Com.Pl.), aff'd, 220 Pa.Super. 730, 283 A.2d 86 (1971) (per curiam) (where Pennsylvania court found marriage between first cousins contracted in India, where such marriages were permitted, would be recognized as valid in Pennsylvania). Like the foregoing courts, we too find that although Louisiana law expressly prohibits the marriages of first cousins, such marriages are not so "odious" *750 as to violate a strong public policy of this state. Accordingly, a marriage between first cousins, if valid in the state or country where it was contracted, will be recognized as valid pursuant to LSA-C.C. art. 3520.

II. INTERLOCUTORY JUDGMENTS
Having resolved the substantive issues raised in this appeal, we turn now to address Ms. Ghassemi's assignments of error pertaining to the family court's interlocutory judgments.[36] In particular, Ms. Ghassemi complains that the family court erred in granting Mr. Ghassemi's motion to quash, motion for a protective order, and motion to stay discovery regarding personal and business financial information. She further argues that the family court erred in ordering her to pay $1,500 in attorney fees, pursuant to LSA-C.C.P. art. 1469(4), and in deferring a ruling on her motion for a paternity test.
Generally, a court has broad discretion in ruling on pre-trial discovery, and an appellate court should not upset such rulings absent an abuse of that discretion. See Bell v. Treasure Chest Casino, L.L.C., XXXX-XXXX, pp. 3-4 (La.2/22/07), 950 So.2d 654, 656; Lawrence v. City of Shreveport, 41,825, p. 11 (La.App. 2 Cir. 1/31/07), 948 So.2d 1179, 1187, writ denied, XXXX-XXXX (La.4/20/07), 954 So.2d 166. That discretion encompasses the award of attorney fees in accordance with LSA-C.C.P. art. 1469(4).
In light of the procedural posture of the case at the time of the family court's rulings, we find no abuse of discretion. The family court's judgments pertaining to the discovery of financial information were simply based upon the pending trial to discover if a marriage had even occurred, an essential prerequisite to Ms. Ghassemi's alleged causes of action. Ms. Ghassemi was well aware that Mr. Ghassemi was challenging the existence of the purported marriage. The family court's judgments were not intended to deny Ms. Ghassemi the right to obtain discovery. Rather, they were merely intended to delay discovery of highly personal information pending a scheduled trial to determine whether the parties had indeed been married. Furthermore, we find that the award of attorney fees was permissible pursuant to LSA-C.C.P. art. 1469(4).
Finally, we find no error in the family court's deferral of Ms. Ghassemi's motion for a paternity test in light of LSA-R.S. 9:396 and LSA-C.C.P. art. 1464. The paternity of Hamed, now 29 years old, is not a "relevant fact" in this action for a divorce, spousal support, and a partition of the community property, nor is the mental or physical condition of a party, or of a person in the custody or under the legal control of a party, in controversy herein.[37] Accordingly, we find Ms. Ghassemi's assignments of error pertaining to the interlocutory judgments of the family court to be without merit.

CONCLUSION
For all of the above and foregoing reasons, the interlocutory judgments rendered *751 on August 29, 2006, October 24, 2006, and December 5, 2006, are affirmed. The final judgment signed on June 13, 2007, is hereby reversed, and this matter is remanded to the family court for further proceedings consistent with the opinions expressed herein. All costs of this appeal are assessed to Hamid Ghassemi.
INTERLOCUTORY JUDGMENTS RENDERED ON AUGUST 29, 2006, OCTOBER 24, 2006, AND DECEMBER 5, 2006, AFFIRMED. JUDGMENT OF JUNE 13, 2007, REVERSED AND REMANDED WITH INSTRUCTIONS.
PARRO, J., concurs.
NOTES
[1] After entering the U.S., Mr. Ghassemi resided in Indiana, where he attended a university.
[2] This "marriage" was contracted in Indiana in 1978 or 1979 and was terminated in 1983. Mr. Ghassemi became a U.S. citizen in 1989.
[3] Hamed became a naturalized citizen in 2003.
[4] Mr. Ghassemi and the woman he "married" in 2002 executed a separation of property agreement.
[5] We may take judicial notice of Iranian law pursuant to LSA-C.E. art. 202, which provides, in pertinent part, as follows:

B. Other legal matters. (1) A court shall take judicial notice of the following if a party requests it and provides the court with the information needed by it to comply with the request, and may take judicial notice without request of a party of:
* * *
(f) Law of foreign countries, international law, and maritime law.
* * *
C. Information by court. The court may inform itself of any of the foregoing legal matters in such manner as it may deem proper, and the court may call upon counsel to aid it in obtaining such information.
[6] The entirety of Iranian Civil Code article 1045, found in Chapter 3 titled "ON IMPEDIMENTS TO MARRIAGE," provides as follows:

Article 1045  Marriage with the following relations by blood is forbidden, even if the relationship is based on mistake or adultery:
1  Marriage with father or grandfather, mother or grandmothers, or to their ancestors to whatever generation.
2  Marriage with children, or descendants to whatever generation.
3  Marriage with the brother and sister and their children, or their descendants to whatever generation.
4  Marriage with one's own paternal aunts and maternal aunts and those one's [sic] father, mother, grandfathers and grandmothers.
[7] No transcription of this hearing appears in the record; however, transcripts of later proceedings indicate that the family court intended to conduct a trial on December 6, 2006, to determine, first, if a marriage had taken place, and if so, to determine whether such a marriage was valid in Louisiana. If it determined the foregoing issues in the affirmative, the family court would then address Ms. Ghassemi's petition for divorce.
[8] The court minutes erroneously record that the hearing was held on December 6, 2006. However, it is clear from the transcription of the proceedings on December 6, 2006, as well as other subsequently filed pleadings, that the hearing on the dilatory exception was conducted on December 5, 2006.
[9] Although there is some confusion on Ms. Ghassemi's part as to whether the family court treated the matter as a summary proceeding or as an ordinary proceeding, the family court expressly referred to the proceeding as a "trial." In addition, Ms. Ghassemi has conceded that the matter was not scheduled on a "rule day."
[10] Because the instant matter does not involve the recognition of a legislative act, public record, or judicial decision of another U.S. state, the full faith and credit clause found in Art. IV, § 1 of the U.S. Constitution is not implicated in this case.
[11] On appeal, Ms. Ghassemi challenges the type of proceeding utilized to entertain Mr. Ghassemi's request for declaratory relief. As previously noted, the record before us contains no transcript of the hearing on Ms. Ghassemi's exception and objection or of the family court's reasons and ruling. In addition, the record lacks a written judgment or a complete minute entry from which we might discern exactly what transpired. Despite her personal knowledge of the matter, Ms. Ghassemi's own assignments of error reflect her uncertainty as to whether the family court ultimately treated Mr. Ghassemi's request for declaratory relief as a rule, and thus as a summary proceeding, or as a trial by ordinary proceeding, or even as a cumulation of the two, i.e., a petition for declaratory judgment and rule to show cause, as argued by Mr. Ghassemi. If the last, we have no way of determining whether Ms. Ghassemi objected based on the improper cumulation of actions, or whether the family court intended to treat the matter as a proceeding granting supplemental relief in accordance with LSA-C.C.P. art. 1878.

Assuming that the family court construed Mr. Ghassemi's pleading as a petition for declaratory relief, Ms. Ghassemi complains that she received no citation. Notwithstanding the fact that the record before us contains no evidence, one way or another, on the matter, we note that a reconventional demand does not require citation. LSA-C.C.P. art. 1063. Although not raised by Ms. Ghassemi, we further note that the record does not contain any written leave of court permitting Mr. Ghassemi to file his reconventional demand. See LSA-C.C.P. art. 1033. However, given the incomplete nature of the record, we cannot say that such leave was not granted orally. See Gotro v. State ex rel. Dept. of Transp. and Development, 98-748, pp. 3-4 (La.App. 3 Cir. 12/9/98), 722 So.2d 100, 101.
[12] Louisiana Civil Code article 3516 clarifies that the word "state," as it appears in LSA-C.C. arts. 3519 and 3520, "denotes ... the United States or any state, territory, or possession thereof ... and any foreign country or territorial subdivision thereof that has its own system of law." (Emphasis added.)
[13] For the purposes of this opinion, a foreign marriage is one that is contracted in another state or another country.
[14] "Comity" is defined in BLACK'S LAW DICTIONARY 267 (6th ed.1990) as "courtesy; complaisance; respect; a willingness to grant a privilege, not as a matter of right, but out of deference and good will.... In general, [the] principle of `comity' is that courts of one state or jurisdiction will give effect to laws and judicial decisions of another state or jurisdiction, not as a matter of obligation but out of deference and mutual respect."
[15] Prior to the enactment of LSA-C.C. art. 3520, the validity of a foreign marriage was determined under the doctrine of comity. See, e.g., Succession of Caballero, 24 La.Ann. 573 (1872). However, the analysis employed under the doctrine of comity required the court to determine if the marriage was valid where it was contracted and whether recognizing it would violate the public policy of this state. Thus, LSA-C.C. art. 3520 essentially codified the previous comity analysis. Consequently, if the family court had properly analyzed the issue under the doctrine of comity, as it purported to do, the analysis should have been in accordance with LSA-C.C. art. 3520.
[16] It would be a questionable policy indeed to base the status of private individuals on the fluctuation of international relations.
[17] The family court's "initial" oral ruling and its written reasons for judgment did indicate that the marriage violated public policy. However the final judgment makes no mention of public policy, and it is well-settled that appeals are taken from judgments, not reasons for judgments. Greater New Orleans Expressway Com'n v. Olivier, 2002-2795, p. 3 (La. 11/18/03), 860 So.2d 22, 24.
[18] As noted above, Mr. Ghassemi contends that Louisiana law is implicated under LSA-C.C. art. 3519. Given her argument, Ms. Ghassemi apparently agrees with this contention.
[19] In making its determination, the family court placed considerable emphasis on the fact that Iran is not a signatory to the "Hague Convention of 14 March 1978 on [the] Celebration and Recognition of the Validity of Marriages." However, it failed to recognize that the U.S. is not a signatory either. Thus, we agree with Ms. Ghassmei's argument that this Convention was completely irrelevant and that the family court erred in admitting it and in relying upon it in making its decision.
[20] Despite the family court's comments to the contrary, documentary evidence is not required to prove the existence of a marriage. See Succession of Cusimano, 173 La. 539, 541, 138 So. 95, 95 (1931); Bridges v. Osborne, 525 So.2d 337, 341 (La.App. 1 Cir.), writ denied, 530 So.2d 567 (La. 1988); Heirs of Hutton v. Self, 449 So.2d 553, 554 (La.App. 1 Cir.), writ not considered, 457 So.2d 8 (La. 1984).
[21] Comment (c) to LSA-C.E. art. 902 recognizes that the procedure for the authentication of foreign documents pursuant to paragraph (3) of that article will, in many instances, be superseded by the simpler method of certifying documents that is provided for in the Convention.
[22] A court may take judicial notice, whether requested or not, of any fact, not subject to reasonable dispute because it is capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. LSA-C.E. art. 201(B)(2) and (C).
[23] As pointed out by Ms. Ghassemi, Iran has an Iranian Interests Section in the Pakistani Embassy in Washington, DC, which certifies U.S. documents for their use in Iran.
[24] In the event that Mr. Ghassemi challenges the marriage's validity under Iranian law (on any other basis) at the trial on the merits, the family court must make a determination as to whether the marriage was valid in Iran, and in so doing, must consider Iranian law.
[25] A marriage by procuration occurs when one party is not present but, instead, is represented by another person. See LSA-C.C. art. 92, comment (b).
[26] Obviously, given its prohibition, Louisiana does have a policy against such marriages. However, the prerequisites to a valid marriage in Louisiana vary in their significance. Some are more serious, while others are less so. See, e.g., Katherine Shaw Spaht, The Last One Hundred Years: The Incredible Retreat of Law From the Regulation of Marriage, 63 La. L.Rev. 243, 251-252 (2003).
[27] A previous attempt to revise former Article 95 by 1900 La. Acts, No. 120 to prohibit marriage between first cousins was unsuccessful due to a procedural flaw. See State ex rel. Caillouet v. Laiche, 105 La. 84, 29 So., 700 (1901).
[28] The text of the article suggested that such marriages would be valid as long as citizens moved for a sufficient period of time so as to acquire domicile in another state that allowed such marriages. From this, it is implicit that Louisiana would recognize marriages contracted between collaterals in a state or country that sanctioned such marriages, so long as the parties were not domiciliaries of Louisiana at the time the marriage was confected.
[29] A "fugitive marriage" occurs when a domiciliary of Louisiana intentionally seeks to evade the laws of this state by temporarily repairing to another state or country solely for the purpose of contracting a marriage that he is prohibited from contracting at home. See LSA-C.C. art. 94, comment (d); see also Succession of Gabisso, 119 La. 704, 713-14, 44 So. 438, 441 (1907). It was reasoned that Louisiana could not give effect to these acts without sanctioning an evasion of its laws. Therefore, as explained by the redactors of the Civil Code of 1825, it was deemed necessary that: "[A] marriage made in a foreign country [or state] between two inhabitants of this state, who have not lost their domicile here, and who afterwards return here to reside, ought to be governed by our laws and not by those of the country [or state] where the marriage was celebrated." Projet of the Civil Code of 1925 at 2 (La. State Law Inst. Transl.1937).
[30] According to LSA-C.C. art. 94, comment (d), prospective fugitive marriages contracted by Louisiana domiciliaries were originally intended to be governed by former LSA-C.C. art. 15. However, former LSA-C.C. arts. 14 and 15 were amended and reenacted by 1991 La. Acts, No. 923, § 1, effective January 1, 1992, to consist of LSA-C.C. arts. 14 to 49. Pursuant to the statutory revision authority of the Louisiana State Law Institute, LSA-C.C. arts. 15 to 49, as set forth in 1991 La. Acts, No. 923, were redesignated as LSA-C.C. arts. 3515 to 3549. Accordingly, LSA-C.C. art. 94, comment (d) recognizes that, pursuant to the foregoing amendments and reenactments, LSA-C.C. art. 3520 is controlling in the case of a valid fugitive marriage (or LSA-C.C. art. 3519, if the marriage is invalid in the state where it was contracted).
[31] In so concluding, we note that the Louisiana Legislature has not expressly outlawed marriages between first cousins regardless of where they are contracted, as it has emphatically done in the case of purported same-sex marriages. See La. Const. Art. XII § 15; LSA-C.C. art. 3520(B); Tuttle, 12 F.2d at 928 (where the court, noting that Louisiana law did not expressly forbid recognition of a foreign marriage by procuration, stated that "if it was the intention of the Louisiana lawmaker, as a matter of general policy, to provide that no marriage by procuration, whether contracted within or without the state, should be valid within the state ... it undoubtably had the power to do so"). See also Mason v. Mason, 775 N.E.2d 706, 709 (Ind.App.2002), trans. denied, 792 N.E.2d 34 (Ind.2003) (where Indiana court recognized marriage of first cousins contracted in Tennessee, noting that although Indiana prohibited such marriages, it had no statute stating that such marriages violated Indiana's public policy as it did regarding same-sex marriages); Schofield v. Schofield, 20 Pa. D. 805, 807 (Com.Pl. 1910) (where court noted that Pennsylvania's prohibition against marriages between first cousins only applied to marriages contracted within Pennsylvania and that the Pennsylvania Legislature could have prohibited first-cousin marriages no matter where contracted, but had not done so). Our conclusion is further buttressed by the uncertainty that exists regarding the actual basis for the prohibition against marriages between relatives. See LSA-C.C. art. 90, comment (c).
[32] Only marriages between those in the direct lineal line of consanguinity or those contracted between brothers and sisters are thought to violate natural law. See P.H. Vartanian, Annotation, Recognition of Foreign Marriage as Affected by Policy in Respect of Incestuous Marriages, 117 A.L.R. 186, 190(1938).
[33] As noted, first cousins may marry in North Carolina; however state law prohibits the marriage of double first cousins (i.e., those that share all lineal and collateral relatives). N.C. Gen.Stat. § 51-3 (2003).
[34] See National Conference of State Legislatures, State Laws Regarding Marriages Between First Cousins, available at http://www. ncsl.org/programs/cyf/cousins.htm. As of September 1, 2005, Texas no longer allows first-cousin marriages. Tex. Fam.Code Ann. § 2.004(6).
[35] See Ariz.Rev.Stat. Ann. § 13-3608; 720 Ill. Comp. Stat. 5/11-11(2); Ind.Code Ann. § 35-46-1-3; Me.Rev.Stat. Ann. tit. 19-A, § 701(2)(B); Utah Code Ann. § 30-1-1; and Wis. Stat. Ann. § 765.03.
[36] When an unrestricted appeal is taken from a final judgment, the appellant is entitled to seek review of all adverse interlocutory rulings prejudicial to him or her, in addition to review of the final judgment. Rao v. Rao, XXXX-XXXX, p. 6 (La.App. 1 Cir. 11/4/05), 927 So.2d 356, 360, writ denied, 2005-2453 (La.3/24/06), 925 So.2d 1232.
[37] According to Ms. Ghassemi, the sole purpose of her request for a paternity test was to use the results to attack the credibility of Mr. Ghassemi, who had denied paternity. In other words, she only wanted the test to cast doubt on the truthfulness of Mr. Ghassemi's testimony about the issues in this case, which are completely unrelated to paternity.